**BURSOR & FISHER, P.A.**
Neal J. Deckant (State Bar No. 322946)
Luke Sironski-White (State Bar No. 348441)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ndeckant@bursor.com
        lsironski@bursor.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CODY HERNANDEZ and B.C., on behalf of themselves and all others similarly situated,<br><br>              Plaintiffs,<br><br>    v.<br><br> BALLAJ d/b/a KLARITY KRATOM,<br><br>              Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Cody Hernandez and B.C. ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Defendant Ballaj, d/b/a Klarity Kratom ("Defendant" or "Klarity Kratom").

## NATURE OF THE ACTION

1.      This is a civil class action lawsuit against Defendant Ballaj for false, misleading, deceptive, and negligent sales practices regarding its kratom powder, capsule, and liquid extract products (the "Products").  Kratom is a dried leaf that is sold as a loose powder, packaged into capsules, or made into an extract.  However, what reasonable consumers do not know, and Defendant fails to disclose, is that the "active ingredients" in kratom are similar to opioids.  That is, kratom works on the exact same opioid receptors in the human brain as morphine and its analogs, has similar effects as such, and critically, has the same risk of physical addiction and dependency, with similar withdrawal symptoms.  When reasonable consumers think of opiates and opioids, they think of heroin, fentanyl, hydrocodone, oxycodone, and morphine; they do not expect that the "all natural" product bought at their local corner store operates like an opioid, with similar addiction and dependency risks.  Kratom is perniciously addictive – on an entirely different level than caffeine or nicotine – and it has sunk its hooks into tens of thousands of unsuspecting consumers and caused them serious physical, psychological, and financial harm.  Defendant has intentionally and negligently failed to disclose these material facts anywhere on its labeling, packaging, or marketing materials, and it has violated warranty law and state consumer protection laws in the process.

2.      Defendant relies on its Products' innocuous packaging and the public's limited knowledge about kratom and its pharmacology to get users addicted, while reaping profits along the way.  Reasonable consumers do not expect the liquid extract bottles, pouches of kratom powder, and bottles of kratom capsules, which they can purchase at gas stations and corner stores, to contain a Products with the same addictive potential of morphine and its analogs.  Defendant relies on this ignorance and does nothing to correct it.  Such activity is outrageous and is in contravention of California law and public policy.

3.      Defendant and its officers have engaged in a systemic effort to peddle an addictive

substance to unsuspecting and oftentimes vulnerable consumers.  Plaintiffs seek relief in this action individually, and as a class action on behalf of similarly situated purchasers of Defendant's Products, for: (i) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*; (ii) violation of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civil Code §§ 1750, *et seq.*; (iii) violation of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq.*; (iv) breach of implied warranty; (v) unjust enrichment; (vi) fraud by omission; and (vii) negligent misrepresentation.

4.     Because this action concerns issues of addiction and medical status, Plaintiff B.C. is filing under her initials for the sake of her personal privacy.  B.C. is a reasonable consumer who fell victim to Defendant's omissions and misrepresentations about the addictive nature of kratom, which operates like an opioid, and became addicted as a result.  Since addiction issues are still wrongly stigmatized, B.C. is proceeding in this matter anonymously but will reveal her name as necessary to the Court under seal.

## PARTIES

5.     Plaintiff Cody Hernandez is a citizen of California who resides in Sacramento, California and intends to stay there.

6.     Plaintiff B.C. is a citizen of California who resides in Colusa, California and intends to stay there.

7.     Defendant Ballaj is a California corporation with its principal place of business in Los Angeles, California.

8.     Plaintiffs reserve the right to amend this Complaint to add different or additional defendants, including without limitation any officer, director, employee, supplier, or distributor of Defendant who has knowingly and willfully aided, abetted, and/or conspired in the false and deceptive conduct alleged herein.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy

exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

10. This Court has personal jurisdiction over the parties because Plaintiffs reside in California, are citizens of California, and submit to the jurisdiction of the Court, and because Defendant has, at all times relevant hereto, systematically and continually conducted, and continues to conduct, business in this State. Defendant therefore has sufficient minimum contacts with this state, including within this District, and/or intentionally availed itself of the benefits and privileges of the California consumer market through the promotion, marketing, and sale of its products to residents within this District and throughout this State. Additionally, Defendant marketed and sold its kratom to Plaintiffs in this District.

11. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant regularly does business in this District, and the same misrepresentations, omissions, and injures giving rise to the claims alleged herein have occurred in this District (e.g., the distribution and sale of Kratom to Plaintiffs, and Plaintiffs' subsequent addiction to kratom).

## FACTUAL ALLEGATIONS

**Background and Pharmacology of Kratom**

12. Kratom is a drug[1] which is derived from the kratom plant, *mitragyna speciosa*, indigenous to Southeast Asia, where it has been used in herbal medicine since at least the early 19th Century. Use of the plant has been particularly well-documented in Thailand, Indonesia, and Malaysia, and it remains popular in each of those countries to this day. Kratom is the most widely used drug in Thailand, for example.

13. The first reported use of Kratom in the scientific literature dates back to 1836 when it was noted that the leaves of the tree were used by Malays as a substitute for opium.

14. The plant's leaves are harvested, dried, and crushed into a fine powder which is then packaged, either straight into a pouch or in capsules, and sold by manufacturers like Klarity. The drug can also be extracted into a liquid formulation, colloquially called a kratom "shot."

---

[1] Kratom is unregulated by the FDA, so the usage of the word "drug" here is meant in the colloquial sense, rather than as a defined term under the Food, Drug, and Cosmetic Act.

15.     In the West, Kratom is sold through the Internet and at herbal stores, gas stations, corner stores, smoke shops, and "head" shops where it is primarily marketed as an herbal medicine or supplement to treat a variety of ailments (*e.g.*, pain, mental health, opioid withdrawal symptoms), as well as a "legal" or "natural" high by some manufacturers.

16.     The chemicals in the plant which produce a psychoactive effect when ingested are called "alkaloids."

17.     The primary alkaloids in kratom plant leaves responsible for the kratom "high" are Mitragynine[2] ("MG") and 7-hydroxymitragynine ("7-MG").

18.     MG and 7-MG exhibit a wide variety of pharmacological effects, resulting in a highly dose-dependent response.  For example, a low dose (0.5 grams to 3 grams) of kratom is typically described as stimulating or energizing, whereas a high dose (3+ grams) is described as euphoric, sedating, and analgesic.  On the whole, however, kratom's high is not overwhelming like it would be for a "hard" drug like cocaine or heroin – it is somewhat more subtle but its effects are nonetheless substantially similar to opiate-based painkillers such as hydrocodone and oxycodone in sufficient dosages.

19.     Kratom's variable but not debilitating effects have always been part of its appeal.  For instance, the use of kratom in Southeast Asia has been documented back for at least 150 years and the earliest accounts described both a stimulant effect for use in hard day-labor when fresh leaves are chewed, and an analgesic and relaxing effect if brewed into a tea.

20.     MG and 7-MG produce such a wide spectrum of effects because they interact with many different receptors in the brain.  Studies have shown that MG and 7-MG interact with alpha-2 adrenergic receptors (adrenaline), D2 dopamine receptors, and the serotonin receptors 5-HT2A and 5-HT2C, all of which contribute to the drug's mood-lifting and stimulant-like effects.

21.     Most crucially, MG and 7-MG also interact with the mu-opioid receptor.

22.     The mu-opioid receptor is known as "the gateway to addiction" because it is the receptor which all opiates/opioids interact with to produce the classic opiate high: euphoric,

---

[2] Pronounced "Mitra-Guy-Neen."

sedating, and analgesic.  This means that MG and 7-MG interact with the primary receptor that heroin and oxycodone interact with.

23.     There are other opioid receptors, but the mu-opioid receptor produces the most "hedonic" or habit-forming effects such as euphoria and analgesia.

24.     Mitragynine and 7-hydroxymitragynine were found to be more potent to the mu-opioid receptor than morphine via oral administration, 7-MG in particular is 17 times more potent than morphine, though the actual effect of kratom is dose-dependent, as discussed above.

25.     Kratom is therefore considered by health professionals to be similar to an "opioid" and a "quasi-opiate."

26.     The notion that kratom is substantially similar to an opioid, and a quasi-opiate, is reaffirmed by a few facts.  First, kratom's effects are very similar to those of other opioids. Second, when administered, kratom alleviates opioid withdrawal symptoms.  Third, repeated use of kratom in itself results in opioid withdrawal symptoms.

27.     All substances which act on the opioid receptors carry a very high risk of addiction, and kratom is no exception.

28.     Addiction occurs when an opioid is ingested on a regular basis.  Over time, the user develops a tolerance to the drug, requiring increased dosages to get the same effects as a lower dose used to have.  As the dosages go up, the body becomes dependent on some amount of the drug to feel normal.  When the drug is suddenly taken away, the user feels much worse than before they started taking the drug: this is what is known as withdrawal.

29.     Opioids are addictive not just because of the pleasurable effects that they produce, but because sudden cessation of opioid use causes severe withdrawal symptoms which users feel compelled to avoid by taking more of the drug.  The tragedy of addiction is that users want to stop, but they cannot.

30.     The symptoms of kratom withdrawal are very similar to those of traditional opiate withdrawal.  Such symptoms include: irritability, anxiety, difficulty concentrating, depression, sleep disturbance including restless legs, tearing up, runny nose, muscle and bone pain, muscle

spasms, diarrhea, decreased appetite, chills, inability to control temperature, and extreme dysphoria and malaise.

31.     Users typically start substances like kratom because of how good it makes them feel, but, once addicted, they use them to avoid the pain of withdrawal.  It no longer is about getting high, but about not feeling "sick."

32.     With kratom in particular, users note that the addiction sneaks up on them, and that it feels as though, over time, the color has been sapped from their lives.  Long term users of kratom have reported experiencing depression, anxiety, anhedonia, and reduced sex drive.

**Kratom Use and Addiction in the United States**

33.     Kratom use in the United States has exploded over the past decade.  As of 2021, the American Kratom Association estimates that kratom is a 1.3 billion dollar a year industry, with 11 million to 15 million annual users in the United States.

34.     Other studies have found that about 1 million people use kratom in the United States every month.  Two-thirds of those users use kratom daily.

35.     Kratom's popularity can be attributed to a number of factors: first, it is often marketed as a safe substitute for painkillers and appeals to those who equate "natural" with "safe;" second, it has received attention from the media as a "nootropic" or "smart" drug because it is stimulating at low doses; third, its popularity has grown simply because it is so widely available, it produces a pleasurable high, and it is unregulated; finally, users are not aware that it is similar to an opioid with opioid addiction potential.

36.     On the whole, however, kratom is a relatively unknown drug to the average consumer.  Most people in the United States have never heard of it.

37.     The advertisements and commentary about kratom say that it is like a substitute for coffee, a pain reliever, a treatment for opioid withdrawal, an antidepressant, an anti-anxiety supplement, that it improves focus and gives users a boost of energy to get through the day.  These advertisements universally espouse the purported benefits that kratom use can provide, without disclosing that the drug is similar to an opioid with the addictive potential of one.

38.     What's more, because kratom does not produce a debilitating "high" like cocaine or heroin, it is very easy for users to take the drug every day without feeling as though they are developing a drug addiction or harming themselves.  This makes kratom a particularly insidious drug because addiction can sneak up on unsuspecting users and can hold them in its grip despite their best efforts to stop using.  The advertisements and word-of-mouth disclosures do not make this clear to consumers.

39.     Because manufacturers and advertisers of kratom, such as Defendant, do not disclose the addictive potential of this drug, many users have found themselves blindsided when they wake up one morning in the throes of withdrawal after having stopped using what they thought was an innocuous supplement.  They then discover just how painfully dependent they have become on kratom.  Because kratom is relatively unknown in the United States, many did not know where to turn for resources and aid.  Some users come together on the Internet to share their experiences and support each other as they attempt to get off the drug.  There are even well-populated and very active Internet forums serving as support groups for those struggling with and recovering from kratom addiction.

40.     The reports from users who have fallen into addiction, or succeeded in escaping the drug's grasp, are heart-wrenching.  Consistent amongst these reports is the initial shock that users felt when they realized they had become unwittingly addicted, and just how difficult it was for them to stop.  Below are just a few accounts from the "Quitting Kratom" forum on www.reddit.com, which has over 40,000 members as of December 2023:

> About 8 months ago, one user wrote: "I've been on a 50gpd [grams per day] habit for about 4 years.  Like most people here, **I was in denial that the Kratom was causing my multitude of issues. How could it be the Kratom when everyone keeps telling me how great it is?**  I made myself believe that I had underlying issues that the Kratom was helping.  Spoiler: It wasn't.  **I slowly became a shell of the person I used to be. TRUE clinical depression symptoms with zero joy in my life.**  I started browsing this subreddit and reading everyone's stories and I related to every single one.  **Everyone had the same exact experience I had and at that moment I knew it was the Kratom causing my depression.**" (emphasis added).

> About 2 years ago, a gas station employee wrote: "I work at a gas station where we sell kratom such as powders, gold and silver pills and especially shots etc (you know which one I'm talking about) **it's just mind blowing to me how many people are**

**practically addicted and how many customers literally scavenge their money to pay for their daily shot**. Why are people so addicted especially to those shots."

About 7 months ago, a user solicited "extract horror stories" – one user responded: "Took 2-3 shots a day for almost 2 years. How did it screw me up? Let me count the ways. Financially it was draining me, 100%! **I would estimate 60% of my hair fell out. My skin was grey. My eyes were dark. I became a hermit.** No longer wanted to do anything, including self care or hygiene. Just taking a shower was a chore I had to talk myself into the last few months. I was disgusting and did not care at all. **All I cared about was that I had enough K for tomorrow.**"

In response to the same "extract horror stories" post, another user responded: "I used [kratom extract] pills and sometimes the shots for over 5 years. I'm now 290 days clean from them. **They were so hard to kick bc of how addicting they are.** And you can just walk in the store and buy them. I was spending $45 day on this stuff. **I wasted tens of thousands of dollars on it and my life suffered.** Lots of my hair fell out and it's only now starting to grow back some, I think most of it is gone for good. I'm repairing my marriage and friendships. Everything. Stay away from this stuff."

Another user responded: "Amen. This shit got hold of me as bad as anything else I've ever done... spent WAY more money on these fucking things than real honest to God hard drugs back in the day. **Anywhere from 6-10 of these things daily for... years. Let's call it 7 at an average of $18/pop = $126/day x 30 = $3780/month = about $45k/year.** How fucking embarrassing. I made $140,000 last year living in Georgia (pretty low cost of living) and pretty regularly get busted "borrowing" money from my 10 year old son. Fuck this; I'm not living like this anymore."

About 2 years ago, another user wrote: "I saw 'A Leaf of Faith' and got the impression that kratom was a generally friendly substance to use freely, never knowing how addictive it was, how much it was further numbing me beyond how alcohol already was, how it was slowly wiping out my sex drive, and likely contributing to my perpetual brain fog. … My second attempt [at quitting] was maybe another 7 or 8 months later. Kratom was making me pretty miserable. I was reading posts in this subreddit and I was finally aware of how addicted I was; feeling crappy, sluggish, and sorta spacey pretty much all the time."

About 2 years ago, another user wrote: "What a difficult journey it has been. I was a ~75 GPD [grams per day] user. **Quitting kratom was one of the hardest things I've had to do in my life.** I learned the hard way that kratom causes withdrawals on a work trip 3 years ago. I should have stopped then and there but I gave in because the RLS was so bad. … **Kratom withdrawal is seriously no joke so don't think you're the only one struggling so much.** I'm only a week free but after this experience I know for sure that I will never go back. Good luck everyone!" (emphasis added).

About 2 years ago, another user wrote a post titled *Kratom Is An Addictive Drug*. It said, in part: "It's been 23 hours since my last dose. **I just wanted to give my story hoping that it would help others see that they've been lied to, deceived and manipulated into thinking this plant is 'harmless and safe'.** As a matter of fact, reading the horror stories on this subreddit was the first step in my recovery... I started taking it almost 3 years ago after hearing about it on... well, Reddit. They touted it is a miracle plant that had all the benefits of an opioid with none of the side effects." (emphasis added).

About 19 months ago, another user wrote: "**I think the perfect word to describe Kratom addiction is 'insidious'.** Here is the definition – *'proceeding in a gradual, subtle way, but with harmful effects.'* I think this is why it takes so long to realize what is going on. There was never a rock bottom moment for me like there would be for other more conventional abused drugs. No overdose, no bad behavior, no abusiveness to my family, no DWI, etc.. - It was just a lazy, slow descent into nothingness. I was living in a groundhogs day type of existence. Wake up, go to work, leave work, buy an extract shot or 2, have dinner, drink my shot, mindlessly look at my phone and/or watch TV. Wake up and do it all over again." (italic emphasis in original, bold emphasis added).

About 12 months ago, another user wrote: "I started using k[ratom] when I had knee surgery Dec 2019 so 3 years. **I didn't want to use pain killers because I got sober from alcohol 3/6/2018 and i felt the pain killers were going to make me relapse.** I didn't know I would end up in a worst place as I am now." (emphasis added).

About 2 years ago, another user wrote: "Was in bed all day yesterday fighting withdrawals. I used to even be an athlete - strong lean and fit, until I got on [kratom] shots and extracts. Didn't even get high any more - just wanted to not feel bad."

About 4 years ago, another user wrote: "I researched kratom before using it and almost every site promoted that its harmless with healthy benefits, and that its withdrawals are like coffee for 3 days max. Information wasn't clear that kratom could become a negative addiction that takes months to recover" … "**I took something I thought was helping me for 1.5-2 years, not even knowing the downsides bc that information was so misleading. It fucked up my digestion, energy, mood, brain fog, anxiety, etc. Fuck kratom, and fuck those who peddle it as a harmless cure-all**." (emphasis added)

About 10 months ago, another user wrote: "For any newcomers: this stuff is absolutely no joke. It's not harmless and the wd [withdrawal] is *definitely* **not** like caffeine. I've cold turkey'd caffeine before and I had a slight headache for a couple hours. I definitely have never woken up in a pool of my own sweat from not having my caffeine. … **This stuff is a drug. A serious drug. And it's super freakin addictive.** *Extracts, powder, or in my case, capsules…it doesn't matter.* Yes some forms are more addictive than others but the WD is hellacious no matter how you're taking it." (emphasis added).

About 10 months ago, another user wrote: "This stuff is a drug, and dangerous! **I started taking it because of all the good things I heard and read about it.** I've never been addicted to or dependent on anything before, but this stuff has totally taken control of my life." (emphasis added).

About 9 months ago, another user wrote: "I finally realized a few weeks ago how much of a negative impact kratom was having on my life. I noticed myself planning my whole day around my doses and making sure when I left the house I'd bring an extra dose with me in a shaker bottle. It was heavily affecting my mood overall, but especially in public settings. I did not want to leave my house most days even if I did dose."

About 9 months ago, another user wrote: "I have been taking OPMS black pills for about a year now. It has ran my bank dry. When I wake up in the morning I fucking crave this shit. I have never been addicted to opiates or anything like that. I get to the point where I am going to go cold turkey and am so confident but when I wake up my brain makes me think its okay to go get it. I cant talk to anyone about this in

my family or friends.  I have a very high stress job and am also going through a nasty break up.  I feel so alone with trying to stop and when I betray myself and go to get more, i fight back tears in the parking lot (I am a grown ass man).  I am not an emotional person and in my environment theres no room for emotions.  Should I tapper off?  What the fuck do I do?"

About 3 months ago, another user wrote: "I was taking one to two opms gold shots a day (sometimes three) for about two years straight.  When the 24hr mark hit the withdrawals kicked in hard.  I had become absolutely obsessed with scavenging 20$ togther to make sure I got my shot each day.  Constantly driving to the shop, hoping no one would see me pop out.  I wanted to quit every night but just couldn't stand the withdrawals.  I finally quit (on day 17 ct) with the help of a quit buddy I found in this sub.  I'm still not right at all, RLS is there and my sleep is still off.  I'm sneezing more than I ever have.  But, music is back, I have more money in my pocket and I feel free from the grips.  I've still got a long ways to go but am committed to never touching that shit again.  It brought out the worst version of me."

41.     This Internet forum is filled with accounts just like these.  The stories are consistent – well-meaning people who were looking to feel better, in mind body and spirit, by taking an "herbal supplement," only to end up with an opioid-like addiction.

42.     What is particularly insidious about kratom is that, at the early stages, many users are unaware of its negative side effects and its addictive potential, so when they begin to experience the consequences of addiction they do not attribute it to the kratom.  Rather, they take more of the substance thinking that it is helping them with their malaise.

43.     As these accounts make clear, the addictive potential of kratom is a material fact to reasonable consumers which would help inform their purchase and consumption decisions.  Defendant's products have no warnings, whatsoever, that kratom is similar to an opioid, is habit-forming, and that regular use will result in opioid-like dependency, with withdrawal symptoms similar to those of traditional opioids.

44.     Consumers who knew the truth about kratom would not have purchased Defendant's Products or would have paid less than they did for them.

**Defendant Knew or Should Have Known it was Selling a Highly Addictive Drug to Unsuspecting Consumers**

45.     Despite its traditional medical uses, kratom dependence has been known and observed for a long time and is well-documented in Southeast Asia, where the plaint originates and has the longest history of use.

46.     Addiction to kratom among users in Thailand, Indonesia, and Malaysia has been documented by scientists and researchers in the United States since at least 1988.

47.     Defendant operates under the brand name Klarity Kratom and is one of the largest producers and seller of kratom products in the United States.

48.     Defendant sells kratom powders, capsules, and extracts.

49.     Kratom extracts are a concentrated form of kratom, whereby the active kratom alkaloids (MG and 7-MG included) are distilled from the leaf powder and sold in powder or liquid preparations.

50.     The purpose of kratom extracts is to create a vastly more potent product as there is a greater concentration of MG and 7-MG, and all other alkaloids, by weight compared to regular powder kratom.

51.     No matter what Product consumers take, however, they are exposed to significant levels of addictive alkaloids, even when they take Defendant's recommended dose (6-15 grams per day of dry Product).

52.     Upon information and belief, Defendant has interacted with growers and distributors in Southeast Asia who have disclosed the addictive nature of kratom to it.

53.     Even without such interactions, Defendant has received numerous user reports about the addictive potential of kratom in the United States.

54.     Furthermore, Defendant used to claim on its website that "[kratom] is good for beginners and also for those who are drug addicts.  Because it has stronger features that prevent the symptoms of opiate addicts."

55.     Defendant therefore knew or should have known that the Products it was selling were highly addictive.

56.     Despite this knowledge, Defendant has failed to disclose the addictive potential of kratom on its website or on its Products' packaging.

57.     The furthest that Defendant goes in "disclosing" the addictive nature of kratom is a link in the "terms of purchase" page which goes to FDA import alert 54-15 which states that kratom can cause serious withdrawal symptoms.

58.     Defendant then states that "[w]e do not endorse our product use for any purpose and sell it without any directions for this reason. …Customers are responsible for knowing the risks and issues that could arise from the way they use or handle our products."  Defendant is remarkably silent as to the potential downsides of kratom use despite stating that one of its "two missions" is to "help inform the public about the miraculous herb Mitragyna Speciosa."

59.     Defendant knew or should have known that kratom users can develop an addiction. Yet it makes no attempts to inform customers about this risk.

60.      Defendant's Products' packaging, in particular, is woefully sparse and seems deliberately designed to convey as little information as possible.  A representative image of Defendant's Products is depicted below:



61.     The packaging evokes a connection to nature through its entirely green color scheme and by having two leaves sprout from the letter "Y" in "KLARITY." On the back of each Product's packaging is a bog-standard disclaimer stating that users take responsibility for any adverse events or health complications.

62.     Defendant's kratom extract bottle labeling is substantially the same, with minimal disclosures or warnings, just the brand name and product volume in milliliters :



63.     There is no warning to consumers that the Product interacts with opioid receptors, nor is there any warning that the product is highly addictive and that it should not be taken on a daily basis.

64.     Further, the packaging itself is innocuous.  The company logo includes a pleasant-looking green leaf.  The white texture and green color scheme evoke a sense of lightness and connection to nature.  The extract bottle is reminiscent of a "5-Hour Energy" brand bottle.  Nothing about this packaging would lead reasonable consumers to believe they were purchasing compounds similar to opioids, that act on the same mu-opioid receptors in the brain as opioids do.

65.     Reasonable consumers looking at the Products' packaging would not presume that kratom is highly addictive.

66.     Defendant's website is sparse as well, with next to no text on any of its webpages except for vague statements about the Product.  Warnings are nowhere to be found.



67.     As shown in the screenshot above, Defendant provides the following description for its "Gold" capsules:

> **Embark on a journey of natural well-being** with Klarity Kratom's Gold Kratom Capsules. These carefully crafted capsules are designed to provide you with the authentic essence of high-quality kratom, encapsulating the rich traditions and purity of the plant. Each capsule contains finely ground kratom, ensuring a consistent and reliable experience.

(emphasis added) (site accessed December 14, 2023).

68.     Using phrases like "[e]mbark on a journey of natural well-being" and "rich traditions and purity of the plant," Defendant downplays the seriousness of the drug it is selling to consumers and instead attempts to conjure an impression of kratom as an all-natural alternative to

pharmaceuticals that will promote well-being. Such language is deceitful and harmful to consumers, who rely on Defendant's product statements when making their purchasing decisions.

69. Nowhere does Defendant mention that kratom presents the same addiction problems that former opioid users and other consumers would want to avoid. Those seeking help as they come off opioids may be drawn in by Defendant's statements about kratom without knowing that they risk trading one addiction for another. Defendant has an obligation not only to remove such harmful statements from its website, but to warn consumers about the potential risks of taking kratom and to provide such a warning on the Product labels.

70. The consequences of kratom addiction are not mild: "in humans, opioid-like withdrawal symptoms have been reported following cessation of kratom use," though "the withdrawal syndrome appears to be less severe than withdrawal from morphine."

71. While kratom withdrawal may be "less severe" than morphine withdrawal, that is hardly a seal of approval – morphine withdrawal is one of the most unpleasant experiences that one can endure in modern life. And kratom withdrawal, while perhaps "less severe" than morphine withdrawal, is still an "opioid-like withdrawal" (according to the World Health Organization), with the same physical and mental symptoms.

72. The risk of "opioid-like withdrawal symptoms" is a material fact to reasonable consumers.

73. As a kratom product manufacturer and distributor, Defendant occupied a position of superior knowledge to the average reasonable consumer, who likely knows next to nothing about kratom.

74. Defendant, through its misleading advertising and its failure to disclose kratom's addictive properties on its Products' labels, relied upon the average consumer's incomplete knowledge of kratom to sell its Products and get users addicted to kratom.

75. Defendant fails to disclose kratom's addictive potential because Defendant knows that it is a material fact to reasonable consumers which would influence their purchasing and consumption decisions, likely to Defendant's detriment.

76.     By any metric, Defendant's conduct is immoral, unethical, and contrary to California public policy.

77.     The United States is going through an opiate crisis that is shaking the foundations of our society.  Amid this crisis, Defendant is creating more addicts for no reason other than to line its pockets, without adequate disclosures of its products' risks and through the use of false and misleading packaging.  That cannot – and should not – be allowed, at least when their conduct entails breaches of warranty and violation of state consumer protection statutes (as it does here).

**Plaintiffs Hernandez's Experience**

78.     Plaintiff Hernandez first heard about kratom through a friend who did not mention the risks of dependency or addiction – instead he was told it was like an energy-boosting green tea. As such, Plaintiff Hernandez did not know that kratom was addictive and had no reason to know. He began purchasing Klarity branded kratom capsules in August of 2021 from a "smoke shop" in Sacramento, California.  When Plaintiff Hernandez made his first purchase, he reviewed the Klarity packaging and labels, but there were no disclosures on the package that would have corrected his misunderstanding about the Product's addictive potential.  Because there were no disclosures, Plaintiff Hernandez thought that Klarity kratom could be consumed every day without the risk of physical dependence.

79.     Plaintiff Hernandez later discovered that Klarity kratom was, in fact, addictive, and found himself requiring larger and larger doses to stave off withdrawal.  When Plaintiff Hernandez attempted to cease using kratom he was wracked by intense physical and psychological withdrawal symptoms that were substantially similar to traditional opiate withdrawals – with symptoms including panic attacks, flu symptoms, restless legs, sweating, anhedonia, and severe gastrointestinal distress.  Plaintiff Hernandez realized he was addicted to kratom in November of 2022, and felt that he was being held captive by the specter of withdrawal.  Though Plaintiff Hernandez wanted to stop, he could not.

80.     Plaintiff Hernandez has been unable to kick his addiction to Klarity kratom, despite multiple attempts.  Had Plaintiff Hernandez known that kratom was so addictive, and that cessation

would be so difficult, he would never have purchased the Products.  Plaintiff Hernandez made his purchases in and around Sacramento, California.

**Plaintiff B.C.'s Experience**

81.     Plaintiff B.C. first heard about kratom through web-searches for natural remedies for anxiety and depression.  All of the articles and forum-posts extolled the potential benefits of kratom while assuring her that kratom was not addictive.  As such, B.C. did not know that kratom was addictive and had no reason to know.  She began purchasing Klarity branded kratom capsules and powders in May of 2017 from various "smoke shops" in Yuba City, California; Chico, California; and Colusa, California.  When B.C. made her first purchase, she reviewed the Klarity packaging and labels, but there were no disclosures on the package that would have corrected her misunderstanding about the Product's addictive potential.  Because there were no disclosures, B.C. thought that Klarity kratom could be consumed every day without the risk of physical dependence.

82.     B.C. later discovered that Klarity kratom was, in fact, addictive, and found herself requiring larger and larger doses to stave off withdrawal.  Even when she did take enough to avoid withdrawal, she still experienced negative side-effects from long-term use of the Products, including hair falling out, constipation, and older looking skin.  When her addiction was at its worst, B.C. was consuming over 650 grams of Klarity kratom powder a week.  When B.C. attempted to cease using kratom she was wracked by intense physical and psychological withdrawal symptoms that were substantially similar to traditional opiate withdrawals – with symptoms including panic attacks, flu symptoms, restless legs, sweating, anhedonia, and severe gastrointestinal distress.  B.C. realized she was addicted to kratom in December of 2022, and felt that she was being held captive by the specter of withdrawal.  Though B.C. wanted to stop, she could not.

83.     B.C. has been unable to kick her addiction to Klarity kratom, despite multiple attempts.  Had B.C. known that kratom was so addictive, and that cessation would be so difficult, he would never have purchased the Products.  B.C. made her purchases in and around Colusa, California.

1

## CLASS ALLEGATIONS

2      84.    ***Class Definition***.  Plaintiffs bring this action as a class action pursuant to Federal

3   Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), on behalf of themselves and all other

4   similarly situated consumers, and seek to represent a class (the "**Class**") defined as:

5              All persons in the United States who, within the applicable statute of
               limitations period, up to and including the date of final judgment in
6              this action, purchased Klarity kratom products.

7      85.    Plaintiffs also seek to represent a subclass of all Class members who purchased

8   kratom Products in California, within the applicable statutory period (the "**California Subclass**,"

9   together with the **Class**, the "**Classes**").

10     86.    Specifically excluded from the Class are Defendant and any entities in which

11  Defendant have a controlling interest, Defendant's agents and employees, the judge to whom this

12  action is assigned, members of the judge's staff, and the judge's immediate family.

13     87.    Plaintiffs reserve the right to amend the definition of the Class if discovery or

14  further investigation reveals that the Class should be expanded or otherwise modified.

15     88.    ***Numerosity.***  Members of the Class are so numerous that their individual joinder

16  herein is impracticable.  On information and belief, the Class comprises at least thousands of

17  consumers throughout California.  The precise number of Class members and their identities are

18  unknown to Plaintiffs at this time but may be determined through discovery.  Class members may

19  be notified of the pendency of this action by mail and/or publication through the distribution

20  records of Defendant.

21     89.    ***Commonality and Predominance***.  Common questions of law and fact exist as to all

22  Class members and predominate over questions affecting only individual Class members.

23  Common legal and factual questions include, but are not limited to:

24         a.    whether the labels on Defendant's Products have the capacity to mislead
                 reasonable consumers;

25         b.    whether Defendant knew that kratom is a highly addictive substance;

26         c.    whether Defendant had a duty to inform consumers about the risks inherent
                 to consumption of its Products;

27         d.    whether Defendant's conduct alleged herein violated California's False
                 Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq.*,
28               California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§

1750, *et seq.*, and/or California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*;

    e.    whether Defendant's conduct alleged herein constitutes unjust enrichment;

    f.    whether Defendant's conduct constitutes negligent omission;

    g.    whether Plaintiffs and the Class are entitled to damages and/or restitution; and

    h.    whether Plaintiffs and the Class are entitled to attorneys' fees and costs.

90.    ***Typicality.***  The claims of Plaintiffs are typical of the claims of the Class in that Plaintiffs and the Class sustained damages as a result of Defendant's uniform wrongful conduct, based upon Defendant's failure to inform Plaintiffs and all others similarly situated that its Products are highly addictive and operate similarly to opioids.

91.    ***Adequacy***.  Plaintiffs will fairly and adequately protect Class members' interests. Plaintiffs have no interests antagonistic to Class members' interests, and Plaintiffs have retained counsel that have considerable experience and success in prosecuting complex class-actions and consumer-protection cases.

92.    ***Superiority***.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, *inter alia*, the following reasons: prosecutions of individual actions are economically impractical for members of the Class; the Class is readily definable; prosecution as a class action avoids repetitious litigation and duplicative litigation costs, conserves judicial resources, and ensures uniformity of decisions; and prosecution as a class action permits claims to be handled in an orderly and expeditious manner.

93.    Defendant has acted or failed to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

94.    Without a class action, Defendant will continue a course of action that will result in further damages to Plaintiffs and members of the Class and will likely retain the benefits of its wrongdoing.

95.    Based on the foregoing allegations, Plaintiffs' claims for relief include those set forth below.

1

2

<u>**FIRST COUNT**</u>
**Violations of California's Unfair Competition Law ("UCL"),**
**Cal. Bus. & Prof. Code §§ 17200, *et seq*.**

3

4

96.     Plaintiffs re-allege and incorporate by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

5

6

97.     Plaintiffs bring this claim individually and on behalf of the members of the proposed California Subclass against Defendant.

7

8

9

10

11

12

13

14

98.     The UCL prohibits unfair competition in the form of "any unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act." Cal. Bus. & Prof. Code § 17200.  A practice is unfair if it (1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers. The UCL allows "a person who has suffered injury in fact and has lost money or property" to prosecute a civil action for violation of the UCL.  Cal. Bus. & Prof. Code § 17204.  Such a person may bring such an action on behalf of himself or herself and others similarly situated who are affected by the unlawful and/or unfair business practice or act.

15

16

17

18

19

20

99.     As alleged below, Defendant has committed unlawful, fraudulent, and/or unfair business practices under the UCL by: (a) representing that Defendant's Products have certain characteristics that they do not, in violation of Cal. Civil Code § 1770(a)(5); (b) advertising goods and services with the intent not to sell them as advertised, in violation of Cal. Civil Code § 1770(a)(9); (c) selling addictive substances to unsuspecting consumers and profiting from their addiction; and (d) failing to disclose that its Products pose a serious risk of addiction;

21

22

100.     Defendant's conduct has the capacity to mislead a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances.

23

24

25

26

27

101.     Defendant's conduct has injured Plaintiffs and the California Subclass they seek to represent in that they paid money for a product that they would not have purchased or paid more than they would have but for Defendant's failure to disclose the addictive nature of its Products. Such injury is not outweighed by any countervailing benefits to consumers or competition.  Indeed, no benefit to consumers or competition results from Defendant's conduct.  Since consumers

28

1    reasonably rely on Defendant's labels, and thus also its omissions, consumers could not have

2    reasonably avoided such injury.  *Davis v. Ford Motor Credit Co.*, 179 Cal. App. 4th 581, 597-98

3    (2009); *see also Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 257 (2010)

4    (outlining the third test based on the definition of "unfair" in Section 5 of the FTC Act).

5        102.    Pursuant to California Business and Professional Code § 17203, Plaintiffs and the

6    California Subclass members seek an order of this Court that includes, but is not limited to, an

7    order requiring Defendant to (a) provide restitution to Plaintiffs and the other California Subclass

8    members; (b) disgorge all revenues obtained as a result of violations of the UCL; and (c) pay

9    Plaintiffs and the California Subclass members' attorneys' fees and costs.

10       103.    Here, equitable relief is appropriate because Plaintiffs may lack an adequate remedy

11   at law if, for instance, damages resulting from their purchase of the Product is determined to be an

12   amount less than the premium price of the Product.  Without compensation for the full premium

13   price of the Product, Plaintiffs would be left without the parity in purchasing power to which they

14   are entitled.

### SECOND COUNT
**Violation of California's Consumers Legal Remedies Act,**
**Cal. Civ. Code §§ 1750, *et seq.***

17       104.    Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

18       105.    Plaintiffs bring this claim individually and on behalf of the California Subclass

19   against Defendant.

20       106.    Plaintiffs and California Subclass Members are consumers within the meaning of

21   Cal. Civ. Code § 1761(d).

22       107.    Cal. Civ. Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have

23   sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not

24   have or that a person has a sponsorship, approval, status, affiliation, or connection which she or she

25   does not have."

26       108.    Cal. Civ. Code § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a

27   particular standard, quality, or grade, or that goods are of a particular style or model, if they are of

28   another."

109.    Cal. Civ. Code § 1770(a)(9) prohibits "advertising goods or services with intent not to sell them as advertised."

110.    Defendant violated Cal. Civ. Code §§ 1770(a)(5), (a)(7), and (a)(9) by intentionally and misleadingly representing that its Products are "all natural" and by failing to disclose that its Products are addictive, a fact which is material to reasonable consumers such as Plaintiffs and the California Subclass members.

111.    Defendant's misrepresentations and omissions deceive and have a tendency and ability to deceive the general public.

112.    Defendant has exclusive or superior knowledge of kratom's addictive nature, which was not known to Plaintiffs or the California Subclass Members.

113.    Plaintiffs and California Subclass Members have suffered harm as a result of these violations of the California Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.* ("CLRA") because they have incurred charges and/or paid monies for the Products that they otherwise would not have incurred or paid had they known that kratom is addictive and causes withdrawals.

114.    Plaintiffs, on behalf of themselves and all other members of the California Subclass, seek an injunction prohibiting Defendant from continuing their unlawful practices in violation of the CLRA.

115.    In compliance with the provisions of California Civil Code § 1782, Plaintiffs sent written notice to Defendant on December 19, 2023, informing Defendant of their intention to seek damages under California Civil Code § 1750.  The letter was sent via certified mail, return receipt requested, advising Defendant that they were in violation of the CLRA and demanding that they cease and desist from such violations and make full restitution by refunding the monies received therefrom.  The letter expressly stated that it was sent on behalf of Plaintiffs and "all other persons similarly situated."  Accordingly, if Defendant fails to take corrective action within 30 days of receipt of the demand letter, Plaintiffs will amend their complaint to include a request for damages as permitted by Civil Code § 1782(d) for Defendant's violations of the CLRA.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**THIRD COUNT**
**Violation of California's False Advertising Law,**
**Cal. Bus. & Prof. Code §§ 17500, *et seq.***

116.   Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

117.   Plaintiffs bring this claim individually and on behalf of the California Subclass against Defendant.

118.   Defendant's acts and practices, as described herein, have deceived and/or are likely to continue to deceive Class Members and the public.  As described above, and throughout this Complaint, Defendant misrepresented that kratom is not addictive.  Such representation is not true.

119.   By its actions, Defendant disseminated uniform advertising regarding its kratom Products to and across California.  The advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.* (the "FAL").  Such advertisements were intended to and likely did deceive the consuming public for the reasons detailed herein.

120.   The above-described false, misleading, and deceptive advertising Defendant disseminated continues to have a likelihood to deceive in that Defendant continues to misrepresent, without qualification, that kratom is not addictive.

121.   In making and disseminating these statements, Defendant knew, or should have known, its advertisements were untrue and misleading in violation of California law.  Defendant knows that kratom is addictive yet fails to disclose this fact to consumers.

122.   Plaintiffs and other Subclass Members purchased Klarity Kratom based on Defendant's representations and omissions that kratom is not addictive.  Once their addictions developed, Plaintiffs felt they could not stop purchasing Defendant's Products despite their efforts to quit.

123.   The misrepresentations and non-disclosures by Defendant of the material facts described and detailed herein constitute false and misleading advertising and, therefore, constitutes a violation of the FAL.

124.    As a result of Defendant's wrongful conduct, Plaintiffs and California Subclass Members lost money in an amount to be proven at trial.  Plaintiffs and California Subclass Members are therefore entitled to restitution as appropriate for this cause of action.

125.    Plaintiffs and the California Subclass Members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices; declaratory relief; reasonable attorneys' fees and costs; and other appropriate equitable relief.

## FOURTH COUNT
### Breach of Implied Warranty

126.    Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

127.    Plaintiffs bring this claim individually and on behalf of the Classes against Defendant.

128.    This claim is brought pursuant to the laws of the State of California.

129.    Defendant, as the designer, manufacturer, marketer, distributor, and/or seller of the Products, impliedly warranted that that kratom is not addictive and does not cause opioid-like withdrawal symptoms.

130.    Defendant breached this warranty implied in the contract for the sale of its kratom Products because the Products could not pass without objection in the trade under the contract description: the kratom Products were not adequately contained, packaged, and labeled as per Defendant's contract with Plaintiffs and members of the Classes, and the Products do not conform to the implied affirmations of fact made on the marketing and packaging for the Products that the Products are not addictive and do not cause withdrawals.  U.C.C. §§ 2-313(2)(a), (e), (f).  As a result, Plaintiffs and members of the Class did not receive the goods as impliedly warranted by Defendant to be merchantable.

131.    Plaintiffs and members of the Classes purchased the Products in reliance upon Defendant's skill and judgment and the implied warranties of fitness for the purpose.

132.    The kratom Products were defective when they left the exclusive control of Defendant.

133.     Plaintiffs and members of the Classes did not receive the goods as warranted.

134.     As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiffs and members of the Classes have been injured and harmed because: (a) they would not have purchased Klarity Kratom on the same terms if they knew that the Product was addictive and could cause opioid-like withdrawal symptoms; and (b) the Products do not have the characteristics, uses, or benefits as promised by Defendant.

135.     On December 19, 2023, Plaintiffs sent Defendant a notice letter that complied in all respects with U.C.C. §§ 2-314 and 2-607.  Plaintiffs' counsel sent Defendant a letter advising Defendant that it breached an implied warranty and demanded that Defendant cease and desist from such breaches and make full restitution by refunding the monies received therefrom. Accordingly, if Defendant fails to take corrective action within 30 days of receipt of the demand letter, Plaintiffs will amend their complaint to include a request for damages as permitted by U.C.C. § 2-607.

## FIFTH COUNT
### Unjust Enrichment

136.     Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

137.     Plaintiffs bring this claim individually and on behalf of the Classes against Defendant.

138.     Plaintiffs and the members of the Classes conferred a benefit on Defendant in the form of the gross revenues Defendant derived from the money they paid to Defendant.

139.     Defendant had an appreciation or knowledge of the benefit conferred on it by Plaintiffs and the members of the Classes.

140.     Defendant has been unjustly enriched in retaining the revenues derived from Plaintiffs and the Class members' purchases of the Products, which retention of such revenues under these circumstances is unjust and inequitable because Defendant omitted that the Products were addictive and similar to opioids.  This caused injuries to Plaintiffs and members of the Classes because they would not have purchased the Products or would have paid less for them if the true facts concerning the Products had been known.

141.    Defendant accepted and retained the benefit in the amount of the gross revenues it derived from sales of the Products to Plaintiffs and the members of the Classes.

142.    Defendant has thereby profited by retaining the benefit under circumstances which would make it unjust for Defendant to retain the benefit.

143.    Plaintiffs and the members of the Classes are, therefore, entitled to restitution in the form of the revenues derived from Defendant's sale of the Products.

144.    As a direct and proximate result of Defendant's actions, Plaintiffs and the members of the Classes have suffered in an amount to be proven at trial.

145.    Here, equitable relief is appropriate because Plaintiffs may lack an adequate remedy at law if, for instance, damages resulting from their purchase of the Product is determined to be an amount less than the premium price of the Product.  Without compensation for the full premium price of the Product, Plaintiffs would be left without the parity in purchasing power to which they are entitled.

146.    Restitution may also be more certain, prompt, and efficient than other legal remedies requested herein.  The return of the full premium price will ensure that Plaintiffs is in the same place they would have been in had Defendant's wrongful conduct not occurred, i.e., in the position to make an informed decision about the purchase of the Products absent omissions with the full purchase price at their disposal.

## SIXTH COUNT
### Fraud by Omission

147.    Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

148.    Plaintiffs bring this claim individually and on behalf of the Classes against Defendant.

149.    Defendant distributed its Products throughout the State of California.

150.    Defendant misrepresented that its kratom Products have attributes or qualities that they do not have by failing to disclose that kratom is addictive and can cause opioid-like withdrawal.

151.     Defendant knows that kratom is addictive because it interacts with kratom vendors, has been made aware of user reports, and has fully characterized kratom's alkaloids and created advanced extraction methods.

152.     Defendant knows that knowledge of kratom's addictive nature is a material fact that would influence the purchasing decision of reasonable consumers.

153.     The average reasonable consumer in the kratom purchasing context does not know that kratom is addictive and cannot reasonably access that information.

154.     Defendant therefore had a duty to Plaintiffs and the members of the Classes to disclose that kratom is addictive and can cause withdrawals on the Products' packaging.

155.     Consumers reasonably and justifiably relied on Defendant's omission because it is reasonable to assume that a product which is addictive like an opioid would bear some kind of a warning.

156.     As a result of Defendant's omission, Plaintiffs and the members of the Classes paid for kratom Products they may not have purchased, or paid more for those Products than they would have had they known the truth about kratom.

## SEVENTH COUNT
### Negligent Misrepresentation

157.     Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

158.     Plaintiffs bring this claim individually and on behalf of the Classes against Defendant.

159.     Defendant distributed its Products throughout the state of California.

160.     Defendant misrepresented that its kratom Products have attributes or qualities that they do not have by failing to disclose that kratom is addictive and can cause opioid-like withdrawal.

161.     Defendant knew or should have known that kratom is addictive because it interacts with kratom vendors and has been made aware of user reports and scientific studies.

162.     Defendant knew or should have known that knowledge of kratom's addictive nature is a material fact that would influence the purchasing decision of reasonable consumers.

163.     The average reasonable consumer in the kratom purchasing context does not know that kratom is addictive and cannot reasonably access that information.

164.     Defendant therefore had a duty to Plaintiffs and the members of the Classes to disclose that kratom is addictive and can cause withdrawals on the Products' packaging.

165.     Consumers reasonably and justifiably relied on Defendant's omission because it is reasonable to assume that a product which is addictive like an opioid would bear some kind of a warning.

166.     As a result of Defendant's omission, Plaintiffs and the members of the Classes paid for kratom Products they may not have purchased, or paid more for those Products than they would have had they known the truth about kratom.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Cody Hernandez and B.C., individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

a.     For an order certifying the Class and naming Plaintiffs as representatives of the Classes and Plaintiffs' attorneys as Class Counsel to represent the Classes;

b.     For an order declaring Defendant's conduct violates the statutes referenced herein;

c.     For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

d.     For actual, compensatory, statutory, and/or punitive damages in amounts to be determined by the Court and/or jury;

e.     For prejudgment interest on all amounts awarded;

f.     For an order of restitution and all other forms of equitable monetary relief;

g.     For injunctive relief as pleaded or as the Court may deem proper; and

h.     For an order awarding Plaintiffs and the Classes their reasonable attorneys' fees, expenses, and costs of suit.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all claims so triable.

Dated:  December 19, 2023                    Respectfully submitted,

**BURSOR & FISHER, P.A**.

By: ___*/s/ Neal J. Deckant*_____

Neal J. Deckant (State Bar No. 322946)
Luke Sironski-White (State Bar No. 348441)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ndeckant@bursor.com
        lsironski@bursor.com

*Attorneys for Plaintiffs*

**<u>CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)</u>**

I, Neal J. Deckant, declare as follows:

1.       I am counsel for Plaintiffs, and I am a partner at Bursor & Fisher, P.A.  I make this declaration to the best of my knowledge, information, and belief of the facts stated herein.

2.       The complaint filed in this action is filed in the proper place for trial because many of the acts and transactions giving rise to this action occurred in this District, and because Plaintiff B.C. and Plaintiff Hernandez reside in this District.

3.       Plaintiff Cody Hernandez alleges that he is a resident of Sacramento, California.

4.       Plaintiff B.C. alleges that she is a resident of Colusa, California.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct, executed on December 19, 2023, at Walnut Creek, California.


                                        */s/ Neal J. Deckant*
                                        Neal J. Deckant